Our first case this morning is United States of America v. Ibrahim McCants. Ms. Oliveira? Good morning. May it please the Court, my name is Leticia Oliveira. I represent Ibrahim McCants. With the Court's permission, I'd like to reserve three minutes for rebuttal. Granted. Thank you. This appeal presents two issues. I'd like to begin with the District Court's denial of Mr. McCants' motion to suppress. We're asking the Court to find, consistent with prior precedent, that officers responding to a vague, anonymous tip should not immediately proceed to a stop-and-frisk where they do not observe any illegal or suspicious conduct whatsoever. This Court very recently recognized in Foster that this Circuit's case law is clear. An excessively general description in the absence of corroborating observations by the police does not constitute reasonable suspicion. Ms. Oliveira, the precedent that you generally rely upon, like Roberson and even J.L., precedes Navarrete, and beyond the reliability of the 911 call in Navarrete, here we also have emergency circumstances that are being described on the call. Why isn't that enough after Navarrete? This Court should absolutely take into account the emergency circumstances of the call. Our argument is not that when officers are confronted with emergency circumstances, they should not respond with urgency and forcefully. However, the allegation of an ongoing emergency does not automatically suggest that the caller is honest. What it implicates is the government interest at stake. The government interests in the case of an emergency call are going to be greater, which impacts the balancing test this Court must do to ensure that the intrusion of the Fourth Amendment rights was justified by the government interest. But I think this case provides a good example of why an emergency caller should not automatically be considered honest because there are going to be situations like this one. But there need to be other corroborating circumstances, right? Like the description was on point. In Navarrete, the description of the license plate was on point, and here the description of the two actors was on point. But you emphasized that when the police arrived, there was no evidence of the beating that the caller had described, correct? That's correct. But you have a problem there, I think, don't you? Because in Navarrete, the description was of someone driving under the influence or driving erratically, and in fact, when the police followed the motorist there, there was no evidence of that driving, right? That's correct. So how does the absence of visible signs of a beating here help you when it seems to be a parallel situation of what the Court found unproblematic in Navarrete? Well, I'll take that question in two parts. Navarrete, it was a close case. By virtue of being a close case, it tells us where the line is for a Fourth Amendment violation. In that case, the Court found that the specificity of the tip lent significant support to its reliability because the information that the caller provided showed that she was necessarily an eyewitness. The officers found what they expected to find based on her tip. The reckless driving that she alleged is the type of offense that can plausibly happen and then be invisible once the officers arrive. The same is true here. So Judge Easterbrook in Wooden says domestic abuse doesn't necessarily result in broken bones or blood. Police don't have to wait until a woman suffers broken bones or blood. And often the suspect may say, you be quiet and act naturally when the police come up to us or you're going to get it. We should want the police to be able to intervene in situations like that and they have plenty of expertise that these can be explosive and dangerous situations long before there is broken bones or blood. Of course, but I think what makes this case unique is that this is not your typical domestic violence case. Domestic violence is, of course, largely considered a hidden crime, but beating someone to death on the side of the road on a Sunday afternoon is not your typical domestic violence case. So while it might have been plausible in Wooden for somebody to not appear to have been involved in a domestic violence incident because there the allegation was that the suspect had flashed a gun at a woman during a verbal argument and immediately put it away. So of course there, just like in Navarrete, it's plausible that the officers do not observe anything that suggests the crime that they are responding to. But here that is not the case. Reasonable suspicion depends on common sense understandings of human behavior. It is not possible for somebody to go from being violently beaten almost to death to three minutes later showing absolutely no sign of that injury. And I don't want this court to understand my argument as requiring some sort of extensive credibility checking. Anonymous tips always require something more. But that something more is not subject to a burdensome standard. There's no dispute here as well that this was an eyewitness to the beating, right? That's right. And there's also no dispute that it is reported to the police officers as a domestic incident, as domestic violence. Well, the caller here, two things. A caller, an eyewitness is not considered reliable just because they say I'm seeing something. I think this court's decisions in Torres and Roberson are a useful illustration of why I see my time is almost running out. But sorry about that. So Torres and Roberson both involved 911 calls where the caller claimed to see something. However, the court came to opposing conclusions because in Roberson you have what the court described as a fleshless tip, which is very similar to what we have here. The caller made a conclusory allegation of a crime. Again, Roberson's 96, so anything well before Navarrete isn't that helpful in Torres was before Navarrete. I believe so. This is a Navarrete case, right? I mean, either the police have a weaker argument than they did in Navarrete or a stronger argument than they had in Navarrete. I don't think Navarrete fundamentally changes this court's approach to anonymous tips because well before Navarrete, this court had already found, just like in Navarrete, that where an anonymous 911 caller provides a sufficiently specific tip, this is what we have in Torres, this is what we have in Nelson, and the officers find a precise match between the information alleged in the tip and their observations, there can be reasonable suspicion even where the officers do not directly observe criminal conduct. But what we didn't have was that the fact of it being a 911 call itself blends reliability. Navarrete adds that to the mix. And then here, isn't this an even stronger case than in Navarrete because it's reporting an ongoing emergency? And Joy, take it from your earlier comments that you agree where there are exigent circumstances that the standard for reliability may be a bit more relaxed. It may be, but remember, it's not just about the use of the 911 system. What the Supreme Court says in Navarrete is that use of the 911 system in and of itself can at least allow a reasonable officer to presume that somebody might think twice about calling in a false report using 911. That, of course, is an assumption that's not going to be true in every case. And when you look at the call, you have to consider the contents of the call. It included no specific information, it was very short, and the caller hung up on the operator. No specific Red Hat raids, particular location, very close in time to when they show up, and being with somebody who was a girlfriend or appeared to be a girlfriend. That's specific information. Well, when you look at the tips that have been found vague in Brown, in JL, and in Roberson, the tip here actually provides less information than the tips that were found vague in that case. Let me suggest you move on because you've got three minutes left. We are interested in your sentencing argument. Of course. I've got two specific sentencing concerns, so let me ask you about the first of them. Your argument is we can't know if this is an A2 or an A3 robbery, right? The government's argument is if you look at the colloquy, at first the judge starts to mention a gun, then he pulls back, then he says, well, you did this with force or threat of force, and your client allocutes to that at the earlier hearing. The government's argument is your client never allocutes to another crime, another first or second degree felony that would be required for A3. So that's a Shepard document. Isn't the only plausible reading of that that your client was allocuting to an A2 robbery? Setting aside the divisibility issue, I know you've got arguments on that, but assume we find it divisible, how do you read this allocution as anything other than allocution to A2? Well, in determining if the modified categorical approach applies, the court has to look at all of the Shepard documents. So that includes not just the plea colloquy, but the charging documents, the commitment orders, and the plea hearing as a whole. At no point is there any specification of what subsection Mr. McCance was charged with, pleading to, or convicted of. So in light of all of that, what you have is a plea colloquy that does not specifically track the language of any one of the three subsections. So under Taylor, that doesn't meet the court's demand for certainty when… And there is no language from A3 about any other felony here. Well, force only appears in subsection A1 of the statute. The model jury instructions show that force and bodily injury, which is what A2 requires, are not interchangeable. Unlike bodily injury, force does not require any bodily harm and need not leave any mark. Again, bodily injury, the bodily injury required for subsection A2 has a temporal requirement. It must be immediate. There's no indication from this plea colloquy that it was immediate. So it's not that he has to… If the government wanted to argue, or if I wanted to argue, if the modified categorical approach applies, if I wanted to say it was A3, then you would have to show that there was another offense. But our argument is that it's unclear. Okay. Let me… One follow-up question. Your best-case scenario is that we think this might have been an A3 felony. But when I look at the New Jersey first and secondary felonies, almost all of them require force or threat. There are some gun trafficking ones, but those don't help you because those would independently trigger the 4B1 enhancement. There's human cloning, which I can't imagine how that would be involved in a robbery. I don't see anything else in there that doesn't involve force or threat. So it either plugs into the elements clause or it plugs into the generic definition of robbery, which requires force, however slight, under graves. So is there any way in which this doesn't map on to at least the generic definition of robbery? Of course. I think what graves emphasizes is that the model penal code definition is very different than the generic offense definition of robbery. New Jersey's robbery definition is based on the model penal code. And even among the 11 states that use the model penal code, New Jersey is very unique because it's one of only three states, along with Pennsylvania and Montana, that includes subsection A3. The reason that is broader than even the generic offense is because subsection A3, by its plain terms, requires no force at all and includes injury to property. It includes offenses like arson and identity theft. Under the categorical approach, we are confined to the elements of the offense. Are arson and identity theft first or second degree felonies? Yes. When we look at graves and Sewell together, don't they make clear that New Jersey's requirements are actually stricter than the federal requirements? That is, in Sewell, the court is concluding that actual knowledge is required, not recklessness in New Jersey. And in the discussion in graves, the court is – we were concluding that our approach was going to be less restrictive than the model penal code when it came to minimus force. So this isn't just that they're coextensive. These cases seem to indicate that we wouldn't even need to make a decision about divisibility or a modified categorical approach because we could just look to the enumerated offense clause to conclude that there is a match. That would be true if New Jersey only included subsection 1 and 2. Nothing in graves specifically references subsection A3. Sewell does not either. I recognize that A3 is a unique subsection of the statute and most likely offenders are going to be convicted under A1 or A2. But as this court recently recognized in Mayo, most likely is not enough for the categorical approach. That's a good point. But following up on that, is there any reason why we wouldn't apply the Moncrief realistic – you know, it has to be a probability, not a hypothetical. I've had a law clerk looking. I cannot find actual robbery cases in New Jersey that are premised on nonviolent crimes. They all seem to involve threats of one source or another, a weapon, something else like that. Why isn't that going to be enough? You're right. It's not just a likelihood. But if we can't find cases that are, you know, you give me your money or I will burn down your house or steal your identity, then that's not enough for Moncrief to hypothesize the arson of the ID theft. I do recognize, as this court recognized in Singh v. Attorney General, that Moncrief does seem to sanction a realistic probability test. But no court has ever undertaken that sort of test because it obviously conflicts with the categorical approach. The purpose of the categorical approach is to focus on whether an offense, a state offense, falls within certain categories. And to do that comparison, the court is confined to the elements of the statute. Now, we're not making any fanciful argument. Any first or second degree felony means any first or second degree felony. But why isn't there a verbatim match then? Because in Graves we said that we look to the model penal code with a couple specific adjustments that we were making. The model penal code includes as its third prong commits or threatens immediately to commit any felony of the first or second degree. In Graves we're saying we use, for the federal generic definition, the model penal code, except that we're not going to require more than de minimis force. I think what Graves says is, in the typical case, the model penal code is going to be a useful starting point. But that's not the case here because so many states define generic robbery in a way that's so different. So what the court is saying is we're not going to look at the model penal code because here it's not a useful guide to what the generic offense is because it's so different. All right. Ms. Oliveira, we'll hear you on rebuttal. Thank you. Mr. Ramsey. Good morning, Your Honors. May it please the Court, Richard Ramsey for the United States. I suppose the best way to start is by acknowledging Judge Krause's question regarding force and the use of the model penal code as the backdrop to the New Jersey robbery statute. And if we look at the explanatory note in the model penal code, section 222.1, it says that robbery requires a victim and it requires threat or use of force. So even under the defendant's theory that this is indivisible, the court still can reach the conclusion, can still affirm the district court by saying, hey, this is a crime of violence, whether or not the statute is divisible or indivisible. Our primary argument certainly is that the statute is divisible. And we know that because of the Ramos and Peppers cases, which tell us that you analyze this by asking two questions. The first question is whether there are alternate degrees of offenses, and you have that here. The second question is there alternate conduct that must be proven beyond a reasonable doubt. The jury instructions here say that. So there's no question that there are two ways that the New Jersey robbery statute is divisible. The second step the court recognizes is asking whether or not which subsection the defendant pled under. And we have a plea colloquy that is unambiguous. The defendant pled guilty to a threat of force. The word threat is only seen in subsection two. But there's no reference specifically to A2, right? There is none. That's a little peculiar. It might be, but we have a plea colloquy that unveils what the defendant pled to. And there's no other subsection that deals with the threat. And to the extent that it's not an exact wording, an exact match, it's threat of force as to threat of bodily injury, we look at the jury instructions at the definition of force, and force includes but does not require bodily injury. So there's no real contest there as to what was really going on. Can we consider the judge's initial reference to a gun before he struck that? Well, the judge struck it. I don't know if that. We don't have any of the other Shepard documents here beyond just this colloquy. No. I mean, we have the indictment and other documents. But certainly, as Judge Hardiman recognized, that none of those documents mention subsection A1, 2, or 3. So the most specific of all the documents is the state colloquy. What do we do with the divisibility of this statute, given that one of the things that we considered significant in Peppers with the Pennsylvania statute was that it specified different penalties, which the Supreme Court has indicated would be a way to ensure that we were looking at different elements, not just different means. The New Jersey statute doesn't appear to do that. It lumps 1, 2, and 3 together, and that adds to distinguish between first and second degree for grading, yet another factor. The statute says first and second degree robbery, which have different penalties. But even if you were to assume that the penalties were not there, that there were not alternate penalties, then you can still look to the fact that each of the subsections require the court or a jury to find the defendant guilty beyond a reasonable doubt. So even if you take the penalty issue aside, you still have a way to find the statute divisible. But the penalty issue here for grading is the addition of attempting to kill or purposely inflicting or attempting to inflict serious bodily injury or being armed with a deadly weapon. Those don't distinguish among the penalties for A1, A2, or A3. That's what we look to in Peppers as significant in the Pennsylvania statute, to treat those as different elements. Well, I would, I guess, ask the court to also look at Ramos, which tells us that the Pennsylvania aggravated assault statute, which it mirrors the layout of the Pennsylvania statute, mirrors what's going on here. You've got different degrees, and also you have different conduct. So either way, if I'm understanding the court's question correctly, either way, you can still find the New Jersey statute divisible. The fact that there may not be different penalties in this particular statute doesn't necessarily mean that these penalties are not listed elsewhere in the code and that you can look to those sections to find out what the penalties are as to first. I mean, there would have to be a penalty issue between first and second degree robbery for the two degrees to make any significance. But the point is that first and second degree robbery could apply to either 1, 2, or 3. Correct. So we don't have here a statute like the Pennsylvania statute with what we consider significant to treat them as different elements, that there is a different penalty or different grading that's associated with each subsection. And that's true. And I apologize if I didn't understand the court's question before. But even though as to each of the subsections there is no distinct penalty, each of those subsections must be proven beyond a reasonable doubt. That's the point that I'm hoping I'm getting across. It doesn't matter whether those particular subsections require different penalties. When I'm saying that I guess the overlaying divisibility issue in the New Jersey statute is that first degree robbery has different penalties than second degree robbery. Then you have to go a step further and find out those specific subsections. Granted, they don't require different penalties, but they do require the court or a jury to find the defendant guilty beyond a reasonable doubt. That would have to be the test for the subsections. But how is that the test for divisibility? I mean, it's always the case that you have to find beyond a reasonable doubt. Even among, say, a listing of different controlled substances, where there is one that is being charged to a jury, they're going to have to find it beyond a reasonable doubt. Well, I think the difference is, for example, in the Mathis case where you have a different locational element. You can do it in any number of – you can commit the burglary in any number of locations, but you don't have to prove those locations beyond a reasonable doubt. Here you do have to prove each of the sub-elements. Which is another way of saying it's about elements, not means. Correct. And the way to test if it's an element is if you have to prove it beyond a reasonable doubt. That's what this court most recently said in Ramos. What about the suppression motion? The suppression motion – The comment about the gun, that was pretty weak, wasn't it? I'm sorry, I didn't hear the question. The comment about the gun seemed pretty weak, didn't it? It was, I think he has a gun, or I'm not sure if I'm quoting exactly. Right. The quote was, I think he has a gun. But that's preceded – that comes after he's beating her really badly, and I think he might kill her. Or he's going to kill her, I think the exact wording is. So that combined with the gun gives the police reasonable suspicion to approach a person. I mean, this is – how is the police supposed to know if a gun was in fact involved? Or how are they supposed to know how to approach or interview anyone if they suspect a gun might be involved? They have to go and approach, frisk, and then ask the questions. I think my opponent has already conceded that they had to interview them, and if they have to interview them with the knowledge that there might be a gun, the only reasonable approach is to search for the gun. And here they didn't even go into his pockets or the bag immediately. They pattered him down first, and then they found the outline of the gun, and then proceeded to do – to retrieve the gun and render it safe, because safety was the primary issue before even asking any questions. J.L. and Lo reject the notion of some gun exception. Or that the possible presence of the gun alone is sufficient to alter the standard of reliability that we're going to require of anonymous tip. That's correct, Judge. But at the same time, we don't just have a gun. We have a beating, an alleged beating. So combined, I don't think we can separate out the fact that a gun was involved in this beating. What do we make of the alleged beating? I mean, first of all, when someone says, I don't know, I think he's going to kill her, is that hyperbole? It's certainly not what the police see when they show up. They don't see anything. So is that disconfirming of the tip? It's not disconfirming. The police might see one thing once they arrive, but, I mean, as we know, from the wooden case and from even materials that are used as training materials, is that domestic violence comes and goes. So whether or not they saw an actual beating once they arrived, that doesn't answer the question as to whether or not the police, a reasonable police officer, having the tip that this caller made would approach the couple and figure out what's going on. It would be a trouble because there's a very short interval before they get there, right? It is. Very short. If it had been a few minutes, it's easier to see how it stopped. But the fact that it's not happening and they're there in 20 seconds, there's discrepancy. I don't think that the court should read anything into that. The defendant doesn't have to be beating the person all the way through, and I think we acknowledge that, or I think the other side acknowledges that, when the police get there, just because they don't actually see the beating doesn't mean that the beating never occurred. As you said earlier, that may give enough for the police to walk up and try to figure out what's going on. But where you have an anonymous tip, a fairly general description, and when the police arrive, their observations are not consistent with what was described, why in that circumstance shouldn't we require that there be more before there is a frisk, before there is a search? I don't think that the tip was that vague. I think you have to think about what the other side is saying. You have to assume, in order not to find this particular couple at this location and that this couple was not easily identifiable, there are maybe ten men with red hats and braids in that area, and they all are with a woman, but that's not what's happening here. The documents assume that this is the only couple that could have fit the description. So having that corroboration, you would have to at least approach them, render the situation safe, and then ask the questions. But that seems circular with such a generic description. It's not clear that this is necessarily the same people, and what they see doesn't match up with the crime that was described or the fact of an emergency that was being described. So why not in that circumstance require the police to at least engage in a colloquy, speak to the two individuals there, even ask if they'll speak separately before ascertaining whether there is reasonable suspicion to take the next step and escalate to a search? Well, I think if the court reviews the police records, one of the police officers, I believe it was Officer Rochester, both Officers Rochester and Patterson, they radio back to the dispatch and ask to make sure that they're getting the right people. And they ask if the person had a red hat and if they had braids, and then they confirm that as they're walking to this couple. So I don't think that the tip was so vague that the police officers didn't have a narrow set of people to choose from. I mean, that's the whole idea behind giving a physical description. If someone's excited about what's going on, they may not have all the details, but they're alleging an active threat. So what if there had been a concert in the park or something? I mean, would you make the same argument? The argument might have to be, that might be a closer question, Judge, because you may not have, unless no one in the crowd has a red hat and no one in the crowd has braids, then, you know, we might have a different situation. I mean, that's, I guess, the case in Ubilis and other cases that deal with just people on the street, and you have callers just calling in saying, you know, there's a gun, he has a gun, we don't know, the police don't really know how they know that they have a gun secreted somewhere on them. You would concede that that would not be enough without the 911, without Navarrete and the fact of the 911 call. Yes. I mean, a description this generic fits squarely with Roberson, with Blow. Correct. So the hat and the braids and the fact that there's someone there that's not, no pun intended, it's not what you're hanging your hat on, right? Right, Judge. But, again, we're looking at the totality of the circumstances, and the totality includes that 911 aspect, which is what Your Honor mentioned to my opponent, that changes the calculus a bit, because you can consider the fact that this is a 911 call, that they're reporting an ongoing emergency, that's a violent crime. Is it the government's position that the reliability of the tip at that point is fixed in time, so that you don't make a further or ongoing assessment in light of the officer's observations when they arrive, or is that an appropriate thing to take account of up to the moment of the search? The cases tell us that all that matters is what the police know when they are approaching someone. What they knew here was that someone called 911, reporting that someone was being beaten, that the person might kill the victim, and that they think that there may be a gun. They also know their observations as they're walking up to. Right.  And they don't know whether there's a gun. So you agree that their observations are relevant to take into account, and in some cases might be sufficiently inconsistent with the tip to undermine reasonable suspicion. They might be inconsistent, yes, in those cases. Like they were in Navarrete. Right. Exactly. As Justice Scalia pointed out in his passionate dissent. Right. Right. But where your observations are not inconsistent. It's not inconsistent to see a couple that matches a description of a call but not see the beating. The beating could have very well happened. It's not an inconsistency. There might be an ambiguity, and you have to now investigate. I think the Supreme Court has said you're entitled to investigate ambiguities, and this is what the officers did here. One last point. Navarrete, one of the significant factors was that this was a serious crime, a specific and dangerous result that could wind up harming somebody. So you can see this would be a different case if they were investigating a crime not nearly as serious as domestic violence. Certainly. The court distinguishes between crimes of general, or in some cases distinguishes between crimes of kind of a general crime versus crimes of an ongoing emergency, and that would be the case there. Thank you, Mr. Rivera. Thank you. We would ask the court to affirm the district court on all decisions. All right. We'll hear Ms. Oliveira on rebuttal. Thank you. To begin with the government's argument about why this statute is divisible, the government has not provided this court with any reliable way of finding that this is a divisible statute. There is nothing about alternatives requiring different proofs being clearly laid out or requiring different conduct that suggests they are elements rather than means. Mathis makes this absolutely clear. Isn't the evidence just the language of the statute? We look at the statute, and how could they not be elements? Well, what Mathis tells us is the only way the text of the statute can indicate divisibility is if the different alternatives carry different punishments. That the alternatives require different conduct or different evidence doesn't suggest that they are elements because by virtue of being statutory alternatives, they're always going to require different things. Mathis identifies that as a way to distinguish elements, but where does it provide that that is the only way to ascertain these are elements rather than means? Well, Mathis says that the inquiry is limited to state law, the record of conviction, and the text of the statute. The text of the statute here breaks out into three different groupings. It's a list of ways robbery can be charged, and each of those three requires something different than the others. Of course, but to reference the example that the Supreme Court used in Mathis and de Camp, the knife, the gun, and the bat are three different things, yet they're still means, not elements. What's going on there is there's a familial relationship. We all understand the genus is weapon, and then there's a bunch of particular species there. Here we have A1, A2, A3, which are, they're just, it's hard to generalize and summarize what all three have in common. I mean, one of them is actual bodily injury. One of them is threatened, and one of them is different felon, right? So the elements or the enumeration of them is counted differently. It's not different kinds of structures or different kinds of weapons that have a familial relationship. Well, there are different types of aggravating conduct that elevate a theft into a robbery. So in that sense, they are similar, and under the categorical approach, you look at what is covered by that aggravating conduct element, and it does include this subsection A3, which doesn't require force. If I could say, if I could address the government's argument regarding the frisk, a useful illustration of what officers should do in this type of situation is in the Second Circuit's decision in Simmons. There, the officers very similarly were responding to an assault in progress from an anonymous caller that might have a weapon. When they arrive on the scene, they confront a scene that is potentially more dangerous than the one here because they are in a high crime area around 4 o'clock in the morning, and they enter a lobby of a building that has large groups of people milling around. When they find someone that matches the suspect's description but is not necessarily involved in an assault, they don't immediately go up to him and stop and frisk him. They see him walking with his hands in his pockets, and they say, can you hold on a second? That is what the officers should have done here, approached, asked a simple question, at least monitored him for a little while. But if there is sufficient indicia of reliability to the call, then they're not required to because it rises to the level of reasonable articulation. Right. If the call contains sufficient details that can be corroborated by the officers, as courts always say, the more things the caller is right about, the more likelihood that they are telling the truth. But where that tip is vague, you can't make the same assumption. Does it add indicia of reliability that in the substance of the call here, what's reported would fall in the realm of an excited utterance or present sense impression, which in terms of hearsay rules and the rules of evidence, that courts have long recognized carry sufficient indicia of reliability to be an exception under Rule 803? Yes, and I think that's consistent with courts traditionally viewing tips from eyewitnesses as more reliable. But you still need a sufficient level of information to reliably conclude that this person is an eyewitness that has some special familiarity with the crime that they're alleging as opposed to some general observer. The person saw this on a particular intersection or block at a particular time. It's not just Red Hat and Braves. It's also with a woman on that block. So hard to see how that wasn't an eyewitness. Well, what we would expect from an eyewitness is for them to be able to provide every detail that they can. This person does not say anything about the victim. She doesn't say anything about how the beating is actually being carried out. Is the person injured? She says that they're at an intersection but doesn't say specifically where. She gives no indication of her location. She hangs up on the operator. I thought you conceded at the outset of your argument and also in the briefing that this was an eyewitness. You said that was not disputed. She is a claimed eyewitness, but the amount of information that she provides does not afford her the same type of reliability that we would normally afford to an eyewitness. That's why the courts always focus not on the fact that the person said I'm an eyewitness but on the quality and content of the information that they provide. Is this a situation like Torres where they're relaying information in a play-by-play fashion, where they are providing information in a manner that suggests this is not somebody that is holding a grudge or seeking to harass someone? Under the totality of the circumstances, you look at how the information is being relayed, what is being relayed, and whether within the totality of the circumstances that caller can be presumed reliable. Thank you, Ms. Oliveira. Thank you. We thank counsel for the excellent arguments, and court will take the matter under advisement.